IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 23, 2007

## STATE OF TENNESSEE v. JAMES ALBERT PIPPIN

**Appeal as of Right from the Criminal Court for Putnam County**
**No. 04-0280   Lillie Ann Sells, Judge**

---

**No. M2005-02556-CCA-R3-CD - Filed April 20, 2007**

---

The Defendant, James Albert Pippin, was convicted by a Putnam County jury of seven counts of aggravated assault and one count of resisting arrest. On appeal, he alleges the trial court improperly denied him judicial diversion at sentencing. After a thorough review of the record and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

William A. Cameron, Cookeville, Tennessee, for the Appellant, James Albert Pippen.

Robert E. Cooper, Jr., Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; William E. Gibson, District Attorney General; Anthony Craighead, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I.  Facts**

This appeal arises from a jury trial where the Defendant was convicted of seven counts of aggravated assault and one count of resisting arrest. The Defendant was acquitted by the jury of seven counts of aggravated kidnapping. Because the Defendant does not contest the convictions themselves, we will briefly describe the facts as presented at trial. We will instead focus more in-depth on the sentencing of the Defendant, which he contests. The following facts were presented at trial.

**A. Guilt Phase**

Six of the victims and three police officers testified for the State. Generally, their version of the events was described as follows: Tiffany Lovell and Toby Lovell were theoretically separated

and soon to be divorced, but they were still having intimate relations. Marsha Burton and Toby Lovell were also having intimate relations, and Tiffany Lovell became aware of this fact. Tiffany Lovell and Burton had discussed the situation a number of times in a somewhat heated manner. On the night of February 17, 2004, one such discussion took place. Burton and Tiffany Lovell verbally sparred on the telephone to the point that Lovell, along with her two-year-old daughter and five of her friends, decided to go over to the Defendant's apartment, where Burton resided, to "settle" things.

The seven piled into a small Geo and proceeded to the Defendant's apartment building, where they squealed the Geo's tires and yelled at Burton, who had appeared from the Defendant's apartment. After once passing through the parking lot in front of the Defendant's apartment, the Geo turned around for another pass. Just then, the Defendant exited his apartment and stopped the Geo at gunpoint. The Defendant, apparently drunk, ordered the seven out of the car and into the apartment. There, they were forced to get on their knees in front of the sofa, while he bragged he could kill them all and dump their bodies where they would not be found. The Defendant put the gun to each of the victims' heads. The individuals described the situation as "terrifying," and they all thought they were going to die. At some point, Toby Lovell was called in an attempt to mediate the dispute and perhaps decide once and for all on one of these ladies, but, as was pointed out at trial, he wisely refused to inject himself into the night's affairs.[1] Nevertheless, after some thirty to forty-five minutes, the Defendant was talked into letting the group go.

The group left and went to Toby Lovell's house where they awaited the police. After discussing the situation with the victims, the officers drove to the Defendant's apartment. They drew their guns and proceeded to the Defendant's door, where they identified themselves. The Defendant partially opened the door, obscuring the left side of his body. He mumbled something to the officers after they demanded to see his hands. The Defendant attempted to shut the door but was blocked by one of the officers. The Defendant then grabbed one of the officer's guns, and a short struggle ensued. The officer was able to pull his gun free of the Defendant's grasp, and the officer hit the Defendant in the head with the gun. The Defendant went down to the ground were he was handcuffed.

The Defendant, his wife, daughter, Burton, and a neighbor testified for the defense as follows: According to the Defendant, he was wakened by Burton, who complained that a group of people were outside making trouble. The Defendant rose from his bed, put on his jacket that happened to contain his handgun, and proceeded outside. The Defendant stepped into the parking lot where he was almost run over by the Geo. The Defendant's reflexes prompted him to raise his gun to stop the car. He then put his gun away, told the individuals to exit the vehicle, and the group followed him into his apartment to discuss and resolve the situation. Once inside, the Defendant retrieved a beer, took off his jacket, and placed the gun upstairs. Burton, the Defendant's daughter, wife, and the neighbor all testified they never saw any gun, and, while the group was in the

---

[1]As the trial court also observed, "handsome Toby" was not called to testify in this case. We, like the trial court, would have greatly appreciated his input.

apartment, the Defendant said he never brought his gun back out. Tiffany Lovell and Burton argued about Toby Lovell for twenty minutes, and then the group left after not settling anything. When the police arrived, they knocked on the door, which was then partially opened by the Defendant. The Defendant asked the officers if they had a warrant, at which time one of the officers came in and hit the Defendant over the head with his gun.

The jury heard this evidence and convicted the Defendant of resisting arrest and seven counts of aggravated assault. The jury acquitted the Defendant of seven counts of aggravated kidnapping.

### B. Sentencing Phase

At the sentencing hearing, Kathy Boles of the Department of Probation and Parole testified that she prepared a presentence report, and she presented that report. That report showed the Defendant had a conviction for reckless driving in 1998. Further, she testified that, at the time of the sentencing hearing, the Defendant was not employed and was not taking any drugs. Boles, on cross-examination, admitted that the Defendant had completed counseling in 2003-04. The Defendant's attorney submitted a progress report that indicated the Defendant's anger was under control. Boles also stated that the Defendant was pleasant and cooperative, and he disposed of the guns that he was in possession of for his previous employment as a gunsmith. The Defendant had never been convicted of a felony prior to this instance, and his only other interactions with the law were speeding tickets and one reckless driving conviction. The trial court noted, but stated it was not considering, three dismissed charges: criminal impersonation, assault, and felony theft.

Upon questioning by the trial court, Boles testified that the Defendant had obtained an associates degree. The trial court questioned Boles about the five prescription medications that the Defendant was taking and observed that the Defendant was no longer in counseling. Boles testified that the Defendant smelled of methamphetamine, but, at the time of the interview, he tested negative for the substance. The Defendant claimed the smell came from an ingredient used to clean his guns. Further, Boles stated that she had met with the Defendant on two occasions, one being in his home. She described his home as a trailer that was "very adequate" and "clean." Although the Defendant did not work, his wife worked part-time with whomever took over the gunsmith business. Boles did not see any guns in the house. Because of his conviction, the Defendant was fired from his job with the United States Postal Service, but the firing is currently being appealed to the Postal Service.

David Reed Cassity, an officer in the United States Army, testified for the defense. He met the Defendant at a gun show, and they began working together in the gun business. Up until the time he was convicted, they had a lucrative business manufacturing and dealing guns to the general public and law enforcement agencies. The Defendant was in line to receive a position as a contractor working for the military until his conviction. He was to work as an armorer on gun ranges, repairing small arms, putting up targets, and pulling bullets for the guns. Cassity testified that the Defendant would not be eligible for this job if he is a convicted felon but that, if the Defendant received judicial diversion, he would most likely receive a job in this area.

Cassity also testified that he assisted the Defendant in divesting his guns as soon as the Defendant was convicted. On cross-examination, Cassity also agreed that someone who had trouble with authority would not necessarily be the best candidate to work in the military, but Cassity stated that he believed that the Defendant would have no trouble working for this particular contractor. If the independent contractor got the bid, there was likely a job waiting for the Defendant.

Barry Wayne Castro, an employee with the United States Postal Service, testified he was the Defendant's supervisor. The Defendant was a good worker with a great attitude, was always willing to help out, and work overtime. Although Castro knew of stress on the Defendant caused by driving eighty miles to and from work, he was not aware of any mental health problems. Although the Defendant had been terminated as a result of these charges, that termination was being appealed.

Laura Rachelle Pippen, the Defendant's sister, testified she worked at the Brushy Mountain Correctional Complex as a clerical corrections officer, and she felt her brother was not the type of person who would benefit from being incarcerated with rapists and murderers. The Defendant was a person who always tried to do the right thing, enjoyed working as a gunsmith, being a marine, and helping local law enforcement and the Army.

Darlene Pippen, the Defendant's wife, testified that the year since his conviction was hard in that the Defendant was attempting to get to know his daughter with the conviction and sentencing hanging over his head. The Defendant had not been in possession of any guns, and she did not think he was any risk to anyone, mostly due to his daughter being in his life. Additionally, the Defendant lost his VA benefits, which included insurance. Because of his lack of insurance, the Defendant can no longer attend counseling.

The State asked the trial court to deny judicial diversion and to impose an enhanced sentence based on the vulnerability of the victims, the risk to human life was high, and because the crime was committed with the potential of bodily injury. The State asked for a four-year sentence, serving six months, and probation for six years.

The defense countered that a high risk to human life is inherent in aggravated assault, so it should not be considered. The defense argued that if the Defendant were granted judicial diversion, he would be able to pursue his profession. The defense also argued that the sentence should be mitigated due to the provocation on the part of the group who came to the Defendant's apartment, and because the incident was an isolated one.

The trial court considered the evidence and determined that the Defendant should not be granted judicial diversion or full probation. The trial court stated specifically that it was concerned about the mental health of the Defendant. The court noted there was evidence throughout the record of the Defendant's problems with anger, stress, and communication. Additionally, the Defendant's resisting arrest was "unsettling" to the trial court. The trial court stated that this offense was especially shocking, excessive and exaggerated, and additionally, to grant probation or judicial diversion would undermine the seriousness of the offense.

In examining the enhancement factors, the court gave little weight to the fact that the victims were particularly vulnerable, but it gave great weight to the fact that the Defendant had no hesitation about committing a crime where the risk to human life was high and the potential for bodily injury was great. After considering the enhancement factors, the trial court settled on a five-year sentence for each count of aggravated assault. As to the mitigating factors, the trial court found that there was no strong provocation and therefore did not reduce the length of the sentences. The trial court ran the sentences concurrently, with all but six months of the sentences suspended.

## II. Analysis

On appeal, the Defendant has contested the denial by the trial court of his request for judicial diversion. When a defendant challenges the denial of judicial diversion, we review the trial court's decision under an abuse of discretion standard. State v. Cutshaw, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997). We must conclude that "no substantial evidence exists to support the ruling of the trial court" if we are to grant the Defendant relief. Id.

Judicial diversion falls under Tennessee Code Annotated section 40-35-313(a)(1)(A), where a judge can defer proceedings without entering a judgment of guilty. The defendant would be placed on probation, but he would not be considered a convicted felon. T.C.A. § 40-35-313(a)(1)(A) (2006). To be eligible for judicial diversion, the Defendant must have pled guilty to, or been found guilty of a class C, D, or E felony, and he must have not previously been found guilty of a felony or class A misdemeanor. The trial court found that the Defendant was eligible for judicial diversion based on these requirements. However, eligibility in and of itself does not entitle a defendant to judicial diversion. State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993), *overruled on other grounds by* State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

Once a defendant is deemed to be eligible for judicial diversion, the trial court must consider several factors when deciding whether or not to grant judicial diversion. Due to the similarities between pre-trial diversion — determined initially by the district attorney general — and judicial diversion, courts draw heavily from pre-trial diversion law and examine the same factors:

> [A court] should consider the defendant's criminal record, social history, mental and physical condition, attitude, behavior since arrest, emotional stability, current drug usage, past employment, home environment, marital stability, family responsibility, general reputation and amenability to correction, as well as the circumstances of the offense, the deterrent effect of punishment upon other criminal activity, and the likelihood that [judicial] diversion will serve the ends of justice and best interests of both the public and the defendant.

Cutshaw, 967 S.W.2d at 344. Additionally, "a trial court should not deny judicial diversion without explaining both the specific reasons supporting the denial and why those factors applicable to the denial of diversion outweigh other factors for consideration." Id. (citing Bonestel, 871 S.W.2d at 168).

In the case at bar, the Defendant made a request for judicial diversion and, in the alternative, full probation. The Defendant noted that he had never been convicted of a felony prior to this case, and his convictions for seven counts of aggravated assault were class C felonies. Additionally, the Defendant argued his home was clean and well kept, he was married, up to this incident he was employed, and he had good prospects for employment should he be granted judicial diversion. The Defendant's employment with the Postal Service was on appeal because he was terminated as a result of his arrest in this case, and he had a potential opportunity to work as an armorer for the United States Army, so he should be granted judicial diversion.

At the sentencing hearing, the trial court first stated its recollection of the facts, and found the circumstances surrounding the crime were very troubling. Although the jury acquitted the Defendant of the seven counts of aggravated kidnapping, the trial court appears to have found the State's witnesses persuasive, stating "[t]his is a case where we have seven teenage victims, very young people, who are marched into his home, put on the floor on their knees and a gun held to the back of their head[s]." The court also found the Defendant was angry, could not sleep, was very stressed, had problems communicating, and had problems with assertiveness. Further, the Defendant's conduct with regard to the police officers was "unsettling" and "disturbing." The trial court also stated it was very concerned about the mental health of the Defendant, and, although the trial court specifically determined it could not and did not consider prior felony charges against the Defendant that were dismissed, the court stated, "I'm not putting that out of my mind." The court found the facts of the offense were "especially violent, . . . horrifying, shocking, reprehensive, offensive [and] otherwise of an excessive or exaggerated degree . . . ." The court considered the potential for rehabilitation and testimony that the Defendant smelled like methamphetamine, though he tested negative for illegal substances. Finally, the court determined that to grant judicial diversion would unduly depreciate the seriousness of the offense.

Based on these considerations, the trial court found the Defendant should not be granted judicial diversion or full probation. Instead, the trial court sentenced the defendant to five years incarceration, with all but six months suspended. We conclude the trial court made sufficient findings to support its denial of judicial diversion, and there is evidence in the record to support its decision. The trial court did not abuse its discretion in not granting judicial diversion. As such, the Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE